## THE GREEN LEAF.

## SHAMROCK TOWING CO., Inc., v. CITY OF NEW YORK.

### No. 15431.

District Court, E. D. New York.

June 19, 1939.

Alexander, Ash & Jones, of New York City, for libelant.

William C. Chanler, Corp. Counsel, of New York City (George Seagrave Franklin and John T. Condon, both of New York City, of counsel), for respondent.

BYERS, District Judge.

This cause presents a narrow question of fact only; that is, whether the deck scow "Green Leaf" was improperly loaded by the Sanitation Department of the City of New York on July 6 and 7, 1936, with ashes and incinerator residue at the Newtown dump.

She was taken in tow, bound for Rikers Island, at 9:40 P. M. (D.S.T.) and arrived at 12:05 A. M. on July 8, after three other scows had been picked up on the Manhattan side.

On arrival, these four vessels were moored to others already there, with bow lines and stern lines. The libelant's scow "Green Leaf" was made fast to the scow "Cleary Bros. No. 54" to port and to the scow "Lawrence McGeeney" to starboard. There were four scows in this tier, of which the "Green Leaf" was the third outboard from the cat walk alongside the pump house on Rikers Island.

The depth of water was from 20 to 25 feet, and this scow drew about 8 feet.

About 5:30 A. M. on the same morning, the scows in this tier were discovered to be "breaking around" and swells were coming in on an ebb tide, presumably from a passing New England Steamship Company vessel identified as the "Providence," bound west through the East River, nearly three-quarters of a mile away. One line to the inboard scow "Cleary Bros. No. 54" parted and the "Green Leaf" capsized, before which her deckload split fore and aft; the outside scow "McGeeney" swung clear of the "Green Leaf"; the bargee was able to jump to "No. 54", and no other damage seems to have been done.

For the libelant, it is contended that the deckload was taken at the Newtown Creek dump, and was improperly stowed, in that there was an obvious list of from a foot to a foot and a half to starboard. That there was a list on arrival at Rikers Island is established by the testimony of Linton, the acting assistant foreman there in charge. This must have attracted his attention, because he made some inspection of conditions below, taking off the hatch cover and grating; he observed water, but considered that conditions were not out of the ordinary. He could not state clearly that he entered the hatches of the other two scows which were alongside, which indicates that he thought it was necessary to make a more than casual inspection of this vessel. Perhaps it is too much to say that he was apprehensive, but certainly he deemed it to be his duty to inspect rather closely.

The "Green Leaf" was carrying about 725 cubic yards of ashes and 700 cubic yards of residue from the incinerator. The latter contains a large percentage of water which finds its way below and has to be pumped as conditions require.

During the afternoon of July 7th, Dellarosa, assistant foreman at the dump, who was on duty from 8 A. M. to 4 P. M., examined the hold in the "Green Leaf"; finding no captain aboard, he pumped the water that he found, so as to reduce the level from 8 inches to 3 inches. Whether this was done to correct an obvious list is of course a matter of argument, but the witness said that a list of from a foot to a foot and a half would be unsafe. The witness Giglio, who was acting assistant foreman on the 4 to 12 P. M. shift on the same day, also did a little pumping. They both deposed that this was for exercise, the thermometer being at 84°.

The scow master Pinto claims to have been on board on July 6th and 7th, and says that the list was so bad that he would not take the boat out, and complained to Giglio, the night man, about it. His refusal to continue resulted in the libelant's sending the witness Olsen about 6:30 P. M. to take his place. Olsen also says that the list was from a foot to a foot and a half, but apparently he saw no reason for not making the trip and, on arrival at Rikers Island, turned in for the night after all lines had been made fast. He said that it was not a dangerous list and that he did not complain to anybody about it.

Upon the testimony as a whole, it is found that, when the "Green Leaf" left the dump, she bore a list to starboard of not less than one foot.

Since neither of the other scows turned turtle, it is fair to conclude that this list of the "Green Leaf" was responsible for her capsizing and, since it appears that she had it on arrival, it is equally fair to conclude that, if she had been properly laden with only the customary trim aft, the loss would not have occurred.

The place of mooring was necessarily exposed to customary swells from passing steamers. The testimony of Captain Touseull of the Sanitation is, that the "Providence" was following her usual course and speed on this morning.

As swells were to be expected, it is not too much to require that the loading of this scow should have been so conducted as not to result in a list which adversely affected her buoyancy, in view of the exposed condition of her anticipated berth at Rikers Island.

The respondent has sought to implead the New England Steamship Company, the owner of the "Providence", and an order to that effect was entered, but proceedings pursuant thereto failed for reasons not affecting the issues here presented.

The libelant may take the usual decree, to be settled on notice.

If findings are desired, they may be settled in connection therewith.